MHK

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TRISHA HOWELL DEVENPORT,        )
                                )
            Plaintiff,          )    No. 08 C 871
                                )
       v.                       )    Magistrate Judge Arlander Keys
                                )
SAM'S CLUB WEST and/or SAM'S    )
CLUB,                           )
                                )
            Defendant.          )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Trisha Howell Devenport began working for Sam's
Club on June 23, 1986, when she was merely a teenager. She
started as a part-time cashier, but was consistently promoted
until she held the position of General Manager. By October of
2000, Ms. Devenport had risen through the ranks to become the
General Manager of Sam's Club's Matteson, Illinois Club.

In mid-2002, Ms. Devenport sought permission to take a
maternity leave of absence under the Family Medical Leave Act,
and Sam's Club granted her request. She began her maternity
leave on July 13, 2002, and returned on November 2, 2002. Before
she began her leave, Ms. Devenport signed a Leave of Absence
Request Form," which stated on its face that "Associates on leave
of absence for longer than 12 weeks are not guaranteed their
previous position on return." It is undisputed that Ms.
Devenport's leave was longer than 12 weeks.

Upon her return from maternity leave, Ms. Devenport was advised that her Club had "high shrink,[1] low Associate morale and engagement" and that, if things did not improve, she would be reassigned. Shortly thereafter, on November 2, 2002, Ms. Devenport was reassigned as Co-Manager of the Rolling Meadows, Illinois Club; although the position was technically a demotion, Ms. Devenport's salary remained constant. At a meeting on November 5, 2002, Ms. Devenport was further advised that, if she did not improve her leadership skills, she could be demoted again and would potentially see her salary cut. According to Sam's Club, Ms. Devenport's performance did not improve, and, in September 2003, she was demoted to Assistant Manager at the Hodgkins, Illinois Club; her pay was reduced from the General Manager pay rate to the Co-Manager pay rate, which (according to Sam's Club) was still more than the pay to which she was entitled as Assistant Manager. She remained in that position, seemingly without incident, for over a year.

On October 25, 2004, with the impending birth of her second child, Ms. Devenport completed and returned a second Family and Medical Leave of Absence Approval form, indicating a leave return date of February 15, 2005. Her last day of work before departing

---

[1]Ms. Devenport testified that "shrink" referred to the missing merchandise unaccounted for; Larry Dodson represented that Ms. Devenport's club was "high shrink" but she testified that she could not remember what the shrink was at her club. Devenport Dep., p. 176.

on leave was November 12, 2004, and her leave officially began on November 15, 2004. She was scheduled to return to work on February 12, 2005 – again, more than 12 weeks after going out on leave. In fact, she did return to work on February 12, 2005 . . . to a job that was apparently the same in title and pay, but different in responsibilities. According to Sam's Club, while Ms. Devenport was on leave, the Club expanded the role of the Business Manager position, so, upon her return, those expanded duties were split between her and another assistant manager, the person who had covered her responsibilities while she was on leave. She was specifically assigned the role of supervising truckload sales, which constituted a significant portion of the Club's sales, because she "was talented at building and managing relationships with the customers who made truckload purchases." Defendant's Mem. In Support of Summary Judgment, p. 3.

In March 2005, Juan Anzar, a field investigator for Sam's Club, was informed that an employee believed Ms. Devenport (whose job it was to increase the number of employees who had credit through the Club) had submitted her for credit without her approval. Mr. Anzar investigated the allegations and ultimately concluded that Ms. Devenport had, in fact, signed employees up for credit without their authorization. As part of his investigation, he interviewed a number of employees who stated that Ms. Devenport had herself engaged in this practice and had

encouraged others to do so; Ms. Devenport admitted as much. Based upon Ms. Devenport's actions – which, in Sam's Club's view, amounted to credit card fraud – Sam's Club decided to terminate Ms. Devenport for "gross misconduct" effective April 8, 2005. At the same time, Sam's Club fired several male assistant managers – also for gross misconduct.

On September 27, 2005, Ms. Devenport filed a discrimination charge with the Illinois Department of Human Rights; in it, she alleged that she was suspended and ultimately fired because of her sex. On February 22, 2007, the IDHR concluded that there was "substantial evidence that a civil rights violation has been committed."

On February 10, 2008, Ms. Devenport filed suit in this court, alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.; pregnancy discrimination in violation of the Pregnancy Discrimination Act, 42 U.S.C. §2000e(k); violation of the Family Medical Leave Act; breach of contract; and intentional infliction of emotional distress. The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on June 30, 2008. The case is currently before the Court on cross-motions for summary judgment.

Sam's Club has moved for summary judgment on all counts, arguing that Ms. Devenport's sex and pregnancy discrimination

claims are barred because she failed to raise them in her administrative charge; that these claims must also fail on the merits because Ms. Devenport cannot show that she was meeting Sam's Club's legitimate expectations, that other male or non-pregnant assistant managers were treated more favorably; and that it had legitimate, non-discriminatory reasons for firing her. Additionally, Sam's Club argues that it is entitled to summary judgment on Ms. Devenport's FMLA and state law claims because they are time-barred and because the claims fail on the merits.

Ms. Devenport filed a cross motion, seeking summary judgment in her favor on the FMLA claims. In addition to the motion for summary judgment, Ms. Devenport has also filed a motion to strike certain portions of an affidavit submitted by Sam's Club in support of its motion; the challenged affidavit is from Wayne Brock, a Sam's Club employee who served as the General Manager at the Hodgkins, Illinois Club when Ms. Devenport worked there.

Discussion

A.   <u>Ms. Devenport's Motion to Strike</u>

Before turning to the merits of the parties' summary judgment motions, the Court considers Ms. Devenport's motion to strike portions of Wayne Brock's affidavit. Ms. Devenport argues that the challenged portions of the affidavit are inconsistent with Mr. Brock's deposition testimony, and they should, therefore, be stricken. As will be clear from the Court's

discussion of the evidence below, this is a bit like the pot calling the kettle black. Nevertheless, the Court agrees that representations made by a witness in a post-deposition affidavit should generally be disregarded when they are inconsistent with and contradictory to that witness's prior deposition testimony. *See, e.g., Gates v. Caterpillar, Inc.,* 513 F.3d 680, 688 n. 5 (7th Cir. 2008)("a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony."). At most, this would mean striking one sentence from Mr. Brock's affidavit (that reading "However, she still was responsible for a full range of Assistant Manager duties."). This is somewhat inconsistent with Mr Brock's testimony that, after returning from leave, Ms. Devenport split the assistant manager duties with Frank Reick, and the Court will, accordingly strike it. Likewise, the Court will disregard those portions of the affidavits submitted by Ms. Devenport that are, in fact, inconsistent with the deposition testimony offered by the affiants.

B.    The Parties' Summary Judgment Motions

Summary judgment is appropriate when the evidence submitted, viewed in the light most favorable to the non-moving party, shows "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23

(1986). In ruling on a motion for summary judgment, the court construes all facts and draws all reasonable inferences from the record in favor of the nonmoving party. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009)(citing *Bell v. Duperrault,* 367 F.3d 703, 707 (7th Cir. 2004)). However, "we are not required to draw every conceivable inference from the record" – only those that are reasonable. *Smith*, 560 F.3d at 699 (citing *Bell*, 367 F.3d at 707; *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)).

As explained above, Ms. Devenport has alleged discrimination based on sex, in violation of Title VII; violation of the Pregnancy Discrimination Act; violation of the Family Medical Leave Act (including allegations that Sam's Club both interfered with her exercise of FMLA rights and that it retaliated against her for exercising those rights); breach of contract; and intentional infliction of emotional distress. Sam's Club has moved for summary judgment on all claims, and so the Court considers each in turn.

1. <u>Ms. Devenport's Discrimination Claims</u>

In her complaint, Ms. Devenport alleges that she was terminated for "gross misconduct," while male managers who behaved similarly were not fired. She also alleges that she did not submit credit applications as charged and that Sam's Club's stated reason for firing her was a pretext for discrimination.

She also alleges that she was demoted, transferred, and ultimately fired because of her gender and because of her two pregnancies and the leave she took with each. Thus, in this action, she alleges both sex discrimination in violation of Title VII, and pregnancy discrimination in violation of the Pregnancy Discrimination Act.

> (a) <u>Preservation of Claims</u>

As an initial matter, the Court must consider whether these claims have been preserved by virtue of the discrimination charges filed before the Illinois Department of Human Rights and the Equal Employment Opportunity Commission.

"[A] plaintiff may go forward with a claim not explicitly stated in the EEOC charge only if the 'allegations fall within the scope of the charges contained in the EEOC complaint.'" *Jayne v. ABF Freight System, Inc.*, 202 F.3d 273, 1999 WL 1075159, at *2 (7th Cir. Nov. 24, 1999)(quoting *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir. 1996)). In determining whether "the allegations in the complaint are within the scope of the charge," the Court must consider whether there is a reasonable relationship between the claims." *Jayne*, 1999 WL 1075159, at *2 (citing *Cheek*, 97 F.3d at 202). For the complaint's allegations to fall within the scope of the charge, the two "must have a common factual basis"; that is, the charge "must implicate the same conduct and individuals" that are included in the complaint.

*Id.* (citing Cheek, 97 F.3d at 202).

In her EEOC charge, Ms. Devenport did claim sex discrimination, but she claimed it only in connection with her suspension on April 2, 2005 and her termination on April 7, 2005. *See* Complaint, Exhibit A. The charge never mentions anything in connection with the demotion she alleges she received in November of 2002, or the reduction in pay she alleges she suffered in 2003. The allegations in her complaint regarding these earlier adverse employment actions do, however, implicate the same person – namely, Larry Dodson. Accordingly, the Court would be reluctant to close the door on these allegations; instead, the Court will consider the substance of the allegations.

As with Ms. Devenport's sex discrimination claim, the Court must consider whether Ms. Devenport's pregnancy discrimination claim has been preserved. "Exhaustion of administrative remedies is a necessary predicate to an action under the Pregnancy Discrimination Act." *Palao v. Fel-Pro., Inc.*, 117 F.Supp.2d 764, 769-70 (N.D. Ill. 2000)(citing 42 U.S.C. §2000e-5(f)(1), which establishes a 90-day deadline for filing a civil action following exhaustion of remedies, and *Zugay v. Progressive Care, S.C.,* 180 F.3d 901, 902 (7th Cir. 1999)).

It is undisputed in this case that Ms. Devenport's complaint to the Illinois Department of Human Rights (IDHR) claimed discrimination based solely on her gender. "When an

administrative charge alleges a particular type of
discrimination, allegations of a different type of discrimination
in a subsequent lawsuit are not reasonably related to the charge
and therefore may not be maintained unless the lawsuit's
allegations can be reasonably inferred from the facts alleged in
the charge." *Palao*, 117 F.Supp.2d at 770 (citing *Cheek v.
Western and Southern Life Ins. Co.,* 31 F.3d 497, 504 (7th Cir.
1994)). Here, that is not the case.

In her EEOC charge, Ms. Devenport lists only one basis for
the alleged discrimination: sex; she does not mention pregnancy
at all. *See* Complaint, Exhibit A. In fact, the charge states
only that she was suspended on April 2, 2005 and discharged on
April 7, 2005 "due to my sex, female." *Id.*, pp. 1, 2. The
investigation report similarly lists the issue/basis as
"Suspension/sex, female" and "Discharge/sex, female." The report
never mentions pregnancy; she alleges that she was fired for
gross misconduct, whereas similarly-situated male managers also
committed gross misconduct, but were not fired. Ms. Devenport's
charge does not even mention her maternity leaves, or that she
had recently returned from maternity leave when she was fired.
In short, Ms. Devenport's PDA claim is not like or reasonably
related to the claim she made in her administrative charge. *See*
*Palao*, 117 F.Supp.2d at 770 (holding that federal allegations of
pregnancy discrimination fell outside scope of IDHR complaint,

which alleged only that plaintiff was "denied a return to work from maternity leave on February 14, 1997, because of [her] physical handicap/disability mobility impairment (right shoulder injury).")

Ms. Devenport argues that, under *Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983), discrimination based on pregnancy *is* discrimination based on sex; thus, she argues, because she claimed sex discrimination in her EEOC charge, she may bring a pregnancy discrimination claim here. She misreads that case. In *Newport News*, the Supreme Court noted that, because only women can become pregnant, a health care plan that limits pregnancy-related benefits necessarily discriminates against women; the Court does not read the case to say that a claim of sex discrimination necessarily encompasses all claims of pregnancy discrimination. Indeed, *Newport News* very clearly acknowledged the distinction between the two bases of discrimination: "By making clear that an employer could not discriminate on the basis of an employee's pregnancy, Congress did not erase the original prohibition against discrimination on the basis of an employee's sex." *Newport News*, 462 U.S. at 684-85. The fact that Ms. Devenport claimed sex discrimination below - a claim having nothing to do with pregnancy - is not enough to preserve her PDA claim here. And, as will be seen, even if the Court did consider the merits of her PDA claim, the claim would

still fail.

### (b)  The Merits of the Discrimination Claims

To prevail on her sex discrimination claim, Ms. Devenport must show that she was a member of a protected class, that she suffered an adverse employment action, that she was performing her job satisfactorily, and that a similarly situated individual outside her protected class was treated more favorably. *LaFary v. Rogers Group, Inc.*, 591 F.3d 903, 907 (7th Cir. 2010)(citing *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001)). For her pregnancy discrimination claim, she must also establish that her employer knew she was pregnant. *Id.* (citing *Griffin v. Sisters of St. Francis, Inc.,* 489 F.3d 838, 844 (7th Cir. 2007)). If she satisfies these elements, the burden then shifts to Sam's Club to identify a nondiscriminatory reason for the actions taken; if it meets this burden, then, to avoid summary judgment, Ms. Devenport must produce evidence that the proffered reason is pretextual. *Id.* (citing *Clay*, 253 F.3d at 1005).

The issues raised in both the sex discrimination and the pregnancy discrimination claim collapse and merge here into one central dispute: given that Sam's Club claims it fired her because she was submitting credit card applications on behalf of employees without their consent, the issue is whether she can produce evidence to show that that was not the case.  If she cannot, then she can hardly be heard to argue that she was

12

meeting Sam's Club's legitimate business expectations.  And, at the same time, she will have failed to undermine the non-discriminatory reason Sam's Club offered for firing her.  If, on the other hand, she can produce such evidence, she accomplishes both and may avoid summary judgment.

Based on the record before it, the Court finds that Ms. Devenport cannot show that Sam's Club's stated reason for suspending and firing her were fake, a mere pretext for discrimination.  The record shows that, shortly after she returned from her second maternity leave, Ms. Devenport was suspended and then fired for entering credit applications for employees when she did not have their consent to do so.  Juan Anzar testified that John Mateyak notified him in March of 2005 that an associate had told him that assistant manager Trisha Devenport had signed them up for GE credit without their approval; he testified that he then began an investigation, and that, in the wake of that investigation, he made the decision to suspend Ms. Devenport.  Anzar Dep., p. 52, 56, 88 (attached as Exhibit 1 to Defendant's Rule 56.1 Statement).  He testified that he made the decision to suspend her because "[b]ased on the investigation [he] didn't think it was right to have her in the building toting keys and security codes based off the case information.  If somebody was truly committing credit card fraud, they should not be liable for the associates nor the building nor

the merchandise." Anzar Dep., p 57.

Mr. Anzar testified that, based upon his investigation, he determined that Ms. Devenport signed up certain Sam's Club associates for credit without being authorized to do so. Anzar Dep., p. 89. Mr. Anzar also testified that, at the time of his investigation, he believed Ms. Devenport had committed credit card fraud; he testified that he thought Mr. Dodson believed she had committed credit card fraud as well. Anzar Dep., p. 69.

Mr. Anzar testified that, as part of his investigation, he accepted and read statements from Priscilla Skenandore, Paula Rich, and Frank Reick, and then he reviewed credit applications and other information, including the MTracks computer information, and interviewed some additional witnesses, including associates who had been signed up for credit without their consent. Azar Dep., pp. 97- 105. He testified that the evidence all pointed to Ms. Devenport and that, under company policy, any time you had "more than two witnesses that's enough to terminate somebody." Anzar Dep., p. 117.

Mr. Anzar testified that, during an interview with Ms. Devenport, she admitted that she told Frank Reick she knew "how to win this credit contest," and that the evidence all pointed to Ms. Devenport keying the credit applications without authorization. Anzar Dep., pp. 117-118. Mr. Anzar testified that he interviewed Ms. Devenport on April 7, 2005, that she

admitted to taking social security numbers off the associate
information and checking MTracks to verify their credit status;
she also admitted that she showed Frank Reick, another manager,
how to do the same thing. Anzar Dep., p. 86. Mr. Anzar
testified that Ms. Devenport did not remember keying any
associates into the system for credit, however. Anzar Dep., pp.
86-87. According to Mr. Anzar's report, Ms. Devenport was
suspended and later terminated for her actions. Anzar Dep., pp.
87-88. Mr. Anzar testified that, based upon his investigation,
he believed Ms. Devenport had committed credit card fraud. Anzar
Dep., p. 124.

On the flip side, Mr. Anzar also testified that Larry Dodson
"wanted to get rid of" Ms. Devenport because "[h]e didn't think
she was a good manager." Anzar Dep., p. 69. He also testified
that Paula Rich hated Trisha Devenport and that she expressed her
feelings to him on many occasions. Anzar Dep., p. 70. He
testified that, in hindsight, he did not think Ms. Devenport
actually committed credit card fraud, yet he admitted he really
had no evidence to support his belief, just the fact that there
were people at the club who "disliked" Trisha Devenport. Anzar
Dep., p. 89.

The record before the Court includes Mr. Anzar's written
report summary, in which he notes his determination that Ms.
Devenport took "social security number off the associate listing

and comparing them to MTracks to see if they had CREDIT" and then she "keyed 7 Sam's Club associates for credit without their approval or authorization." *See* Azar Dep., Exhibit 4 (attached as part of Defendant's Appendix in Support of Summary Judgment, Exhibit 1). According to a note in Mr. Anzar's investigation file, there were 6 associates who complained about being signed up for credit without their consent (their statements are also included in Anzar's file); four of those complaints were verified using MTracks, but for two of the complaints, Mr. Anzar was unable to find documentation to verify them.

Also included in Mr. Anzar's file are Priscilla Skenandore's statement; in that statement, Ms. Skenandore represents that she actually saw Ms. Devenport keying in the unauthorized credit applications and heard her admit that she was doing so to win a credit contest that was then taking place within the company. *See* Anzar Dep., Exhibit 5. In her statement, Ms. Skenandore stated that she was upset by what she saw Ms. Devenport do, and turned to her teamleader, Paula Rich, for guidance; she testified that Ms. Rich told her to talk to the General Manager, Wayne Brock, which she did. *Id.*

Paula Rich's statement is consistent with Ms. Skenandore's; her statement documents the conversation with Ms. Skenandore, where Ms. Skenandore told Ms. Rich what she saw Ms. Devenport do. *See* Anzar Dep., Exhibit 6. Ms. Rich's statement also documents a

conversation she had with Wayne Brock about the unauthorized applications, as well as the actions she took to clear the records from the affected associates' credit reports. *Id.*

The record also includes a statement from Frank Reick detailing the conversation he had with Ms. Devenport on November 12, 2004 regarding what they could do to boost their credit numbers during the then-ongoing credit contest; Mr. Reick's statement is consistent with Ms. Skenandore's and confirms that Ms. Devenport seemed to be advocating signing associates up for credit when they had not authorized her to do so. *See* Anzar Dep., Exhibit 7.

When confronted with Mr. Reick's statement that she ran credit card applications for employees without their permission, Ms. Devenport testified that Mr. Reick's statement was false. Devenport Dep., p. 97. Yet she admitted that she had no evidence to show that Larry Dodson believed it was false; nor did she have any reason to think that Juan Anzar believed it was false. Devenport Dep., p. 97. Thus, even if the Court accepts that Mr. Reick's statement was false, she still has not shown that Mr. Dodson's stated reason for firing her was false, or that his decision had anything to do with her sex.

And, in fact, Mr. Dodson testified that he "absolutely" believed that the "findings and facts were conclusive that Ms. Devenport applied for credit for associates without their consent

or authorization. Dodson Dep., p. 306. He testified that he believed she did it "[b]ecause there [were] witnesses, eyewitnesses – [who] saw Ms. Devenport. She was there, placed in that office at that time – witness at that time. She identified later to Wayne Brock that she had. Mr. Brock recommend that she tell the truth." Dodson Dep., p. 306. He testified that "[t]he eyewitnesses state that Ms. Devenport signed up people for credit without an application. You just state that there was an application. There was not any application. There was no authorization from any of the associates to be signed up. She was viewed by the two associates in the marketing office doing so. She was training one individual how to do it. She was observed by another." Dodson Dep., p. 309.[2]

Mr. Dodson testified that he spoke with both Mr. Reick and Priscilla Skenandore regarding the statements they submitted detailing Ms. Devenport's "gross misconduct." *See* Dodson Dep., p. 338. He testified that, during those conversations, both witnesses verified what they had written. *Id.*, p. 338. He also

---

[2]Mr. Dodson testified that MTracks "is a membership-driven system designed for membership, and it's located in marketing and it's located at our membership desk for anything that has to do with the cardholder information. The Smart System is a system that is more company-driven. You can get sales, you can get a lot more information even your email at one time, in the Smart System You can pull up an associate archive information, time and attendance information, all through the Smart System." Dodson Dep., p. 332. He testified that Ms. Devenport used both systems when committing the "gross misconduct" for which she was fired – "one to look up associate information; the other to enter the information." Dodson Dep., p. 333.

testified that he spoke with Paula Rich and Wayne Brock about the incident. Dodson Dep., p. 343. With regard to the latter, he testified that, during the course of their conversation, Mr. Brock "verified that Ms. Devenport admitted that she'd processed the credit, signed them up without their knowledge." *Id.*, p. 344. He testified that he also met face-to-face with Ms. Devenport, and that, during that meeting, "[a]ll the facts were presented. Ms. Devenport, through her own admission, verified that she does look at associates' Social Security numbers through the Smart System, much like everyone was saying. And based on all the findings that we had, and the conclusion was that we terminate Ms. Devenport. And at that time we terminated Ms. Devenport." *Id.*, p. 349-350. He testified that she was suspended on April 2, and fired on April 7. *Id.*, p. 353.

The record also includes an email from Wayne Brock documenting a conversation he had with Ms. Devenport when she returned from her maternity leave; according to Mr. Brock, when he asked her about the unauthorized credit applications, she admitted that she had "keyed them" but told Mr. Brock they were associates who had filled out credit apps that were referred early." *See* Anzar Dep., Exhibit 9. Mr. Brock testified that Trisha told him she had simply resubmitted applications that had been previously denied; he testified "[y]ou can't do that." Dep., p. 29.

The record also contains Ms. Devenport's exit interview report, which shows that she was involuntarily terminated for "Gross Misconduct - Integrity Issue (Theft, Violent Act, Dishonesty, Misappropriation of Company Assets)." *See* Devenport Dep., Exhibit 28 (attached to Defendant's Appendix, Exhibit 3).

The record includes two pieces of evidence that would seem, at first blush, to support Ms. Devenport's argument that she did not do what the company fired her for doing. The first is an affidavit signed by Juan Anzar, who investigated the alleged misconduct; it was submitted by Ms. Devenport and included as part of Plaintiff's Exhibit H. In the affidavit, dated July 16, 2009, Mr. Anzar states that Mr. Dodson met with him at the Rolling Meadows club after Ms. Devenport started there, and told Mr. Anzar to "keep a close watch on Ms. Devenport" and to find a way to "get rid of her." Anzar Aff., ¶13. This is actually consistent with the deposition testimony to the effect that Mr. Dodson had a "beef" with Ms. Devenport, and with Mr. Anzar's deposition testimony that Mr. Dodson wanted to get rid of Ms. Devenport. But Mr. Anzar also states in his affidavit that, after investigating the credit fraud matter, he determined that "[w]hile it was obvious that someone submitted the unauthorized credit applications, it was unclear who actually processed the applications." *Id.*, ¶27. He states that "[t]here was no concrete evidence that Ms. Devenport had any involvement in any

20

wrongdoing or any participation or knowledge of the credit fraud." *Id.*, ¶30. Mr. Anzar's affidavit is suspect for two reasons. First, Mr. Anzar was fired from Sam's Club on February 16, 2009, Anzar Dep., p. 196, which suggests he might have an axe to grind. But even more problematic, his affidavit is totally inconsistent with his prior deposition testimony, not to mention the deposition testimony of every other witness, including Ms. Devenport. Ms. Devenport testified that she had, in fact, looked up associates' social security numbers; and the testimony of Wayne Brock, Paula Rich, Priscilla Skenandore and Frank Reick were all consistent. Mr. Anzar also says, in his affidavit, that after completing his investigation, he advised Mr. Dodson that "no specific evidence proved that Ms. Devenport committed the fraud." *Id.*, ¶33. Again, this is totally inconsistent with the documentary evidence in the record, and with Mr. Anzar's deposition testimony. Additionally, Mr. Anzar admitted at his deposition that he had no facts or evidence to back up his opinions; these were simply his beliefs. Anzar Dep., p. 188. Most significantly, even accepting as true that Mr. Dodson wanted to get rid of Ms. Devenport, there is nothing in Mr. Anzar's affidavit – or in any other part of the record – to suggest that he wanted to get rid of her because she was a woman, or because she had taken maternity leave.

The second piece of evidence is a "to whom it may concern"

letter written by Colleen Vukovich on April 10, 2005; at that time, Ms. Vukovich was project manager for Sam's Club Operations Development. In that letter, Ms. Vukovich details the day she spent at the Hodgkins club on November 12, 2004, Trisha Devenport's last day in the office before she left on maternity leave and the date on which the unauthorized credit card applications were run. *See* Plaintiff's Exhibits in Response to Defendant's Statement of Facts, Exhibit M. Ms. Devenport relies upon this statement to support her claim that she was not in the marketing office that day and, therefore, could not have entered the unauthorized credit applications. Yet, at her deposition, Ms. Vukovich testified that she did not know for sure whether Ms. Devenport was in the marketing office on her last day of work before leave. Vukovich Dep., p. 65.

In short, Sam's Club offered a legitimate, non-discriminatory reason for firing Ms. Devenport, and the evidence of record all supports that stated reason. Ms. Devenport has offered nothing to suggest that Sam's Club's stated reason was in any way trumped up, or a mere pretext to cover its desire to get rid of her because she was a woman or because she took maternity leave.

Nor can Ms. Devenport show that she was meeting her employer's legitimate business expectations – either in 2005, when she was fired, or in 2002, when she was demoted. According

to performance evaluations completed for the years 2001 and 2002, Ms. Devenport's performance fell short of Sam's Club's expectations. Her 2001 evaluation, which covered the period from February 2001 through January 2002, shows that she received overall scores that fell below the "meets expectations" threshold in all categories. *See* Dodson Dep., Exhibit 24 (included as part of Defendant's Appendix I Support of Summary Judgment, Exhibit 4). Ms. Devenport and Mr. Dodson signed the evaluation on February 16, 2002. For her evaluation covering the period from February 1, 2002 to December 31, 2002, Ms. Devenport received ratings below the "meets expectations" threshold in all categories save one (that entitled "three basic beliefs"); she and Mr. Dodson signed this evaluation on February 3, 2003. *See Id.*

Additionally, Mr. Dodson testified that, under Ms. Devenport's charge, the Matteson club was a "doppler club" before Ms. Devenport even went on leave; by that, he testified, he meant that the club had "low engagement", it's a term the company uses to reflect its concern about what's going on at the club, meaning that "[t]he associates aren't happy" and "[w]e really need to do something about the facility." Dodson Dep., pp. 194-195.

The record shows that, to this end, shortly before Ms. Devenport returned from her first maternity leave in 2002, Larry Dodson and another manager, Ben Dolan, called her to say that

they planned to fill the general manager slot at the Matteson club - the position she held before taking her leave. At that point, Ms. Devenport had been on leave for more than twelve weeks. Ms. Devenport acknowledges that, under company policy, an employee who takes a leave of absence that lasts longer than 12 weeks, is not guaranteed reinstatement. Devenport Dep., p. 358. And she also admits that her leave of absence, which began July 13, 2002 and ended November 2, 2002, lasted longer than 12 weeks. *Id.*, p. 368.

Larry Dodson testified that he and Ben Dolan called Ms. Devenport on or about October 24, 2002 to tell her that, with the holiday season approaching, they planned to "post" the General Manager position at the Matteson club. Dodson Dep., p. 144. He testified that "[t]he decision to get another general manager in that club was made out of necessity of having someone in with a club that's high shrink, low engagement, not the best condition club, and we're going into the holiday season, and feeling like we needed someone there to run - to run the club. That was a business decision that was made because of the length of time we had gone without a general manager in the building." Dodson Dep., p. 144-145. He testified that the decision to post the club was "a corporate decision made on what was best for the club at that particular time." *Id.*, p 170. He testified that he and Ben Dolan made the decision to post the club. *Id.* Ms. Devenport

argues that Mr. Dodson knew exactly when she planned to return from leave, but she does not challenge the assertion that Sam's Club made a business decision to put in a new general manager at Matteson; nor does she argue that Mr. Dodson and Mr. Dolan had some nefarious motive in replacing her – in fact, she testified that Mr. Dodson transferred her at that time in an effort "to get me closer to home so I could spend more time with my baby . . . ." Devenport Dep., p. 170.

The record shows that, upon Ms. Devenport's return to work on November 5, 2002, Larry Dodson and other Sam's Club staff met with her to review her performance and to ensure that she understood what was expected of her. One of those present took notes and then prepared a typewritten memo to summarize those notes. The notes are referred to in the record as Exhibit 72, and the typewritten memo as Exhibit 55 (both are attached to Ms. Devenport's deposition, which is included as Exhibit 1 of Defendant's Rule 56.1 Statement). The notes and the memo suggest that, as of November 5, 2002, the company was not entirely satisfied with Ms. Devenport's efforts. According to the memo, Mr. Dodson noted in the meeting that Sam's Club expected "100% execution at all times" from its management personnel, that Trisha was "not good at execution and it needed to be 100%." Defendant's Appendix in Support of its Reply Brief, Exhibit 1. According to the memo, Mr. Dodson explained to Ms. Devenport

25

during that meeting that he wanted to "put a stable management team in place" at the club, to try to "turn the club around." *Id.* The memo reflects that Mr. Dodson believed that Ms. Devenport had some real strengths: she "was very good at putting on events, programs, community involvement, membership, marketing"; Mr. Dodson stated that Devenport had previously "had a strong sense of urgency, high accountability and was very aggressive all over the club"; he stated, however, that he believed she no longer possessed those qualities; in response, she apparently admitted that she had "just lost focus on her job"; Mr. Dodson also noted that Ms. Devenport had an issue with punctuality. At the end of the meeting, Mr. Dodson apparently advised Ms. Devenport that she "must improve her leadership skills if she is going to continue as a management person"; he advised her that "she must go into the club and be firm, fair and consistent. She must be focused on the job at hand." *Id.* According to the memo, Ms. Devenport left the meeting "in good spirits"; she was positive and "understood what Larry's expectations were." *Id.* Ms. Devenport admitted that Larry Dodson told her that her co-manager status and salary would be changed if she continued the way she was, that she needed to make some changes if she expected to maintain her position and her salary. Devenport Dep., p. 530. She admitted that she had been warned that she needed to change. *Id.*, p. 531.

At her deposition, Ms. Devenport was asked about the notes, and she testified that, in her view, the notes (Exhibit 72) accurately reflected the discussions from that meeting. Devenport Dep., p. 534.

Sue Hartman, who was then regional sales manager for region 17, confirmed that, during the meeting on November 5, 2002, Dodson laid out his expectations for Ms. Devenport and that he told her that if she did not improve, her pay would be affected. Exhibit 36, p. 01903 (included as part of Dodson's Deposition at Defendant's Appendix in Support of Summary Judgment, Exhibit 4). As did Brian Grossi. *See id.*, p. 01902.

Larry Dodson testified that, despite the warnings Ms Devenport received at the November 5, 2002 meeting, her performance did not improve after her transfer to Rolling Meadows. He testified that, during the period from November 2002 to June of 2003, he "was getting feedback on the co-manager and the club manager not being timely for work"; he "was getting feedback on the club had a inventory high shrink"; "the club had low engagement"; and "the standards of the club weren't right and the operational audit was extremely poor." Dodson Dep., p. 215. "In short," he testified, "the performance was not very good." *Id.*, p. 216.

In light of all of this evidence, the Court finds that Ms. Devenport cannot show that she was meeting her employer's

legitimate business expectations – this is especially apparent when the evidence concerning the credit applications is factored in.

Nor has Ms. Devenport demonstrated that similarly situated male managers were treated better. She alleges that she was treated more harshly than male managers who committed similar acts of gross misconduct. And she testified that her sex discrimination claim is based on her belief that "there were other male managers that I've worked with who have been accused of gross misconduct and were not suspended." Devenport Dep., p. 272. Yet, by her own admission, the male manager she claimed received better treatment was not disciplined by Larry Dodson: she testified that the Milton Lynch sexual harassment incident happened in 2000, before Larry Dodson came to Illinois. Devenport Dep., p 303. When asked about her charge, Ms. Devenport testified that she believed she was suspended and terminated because of her sex "[b]ecause there was other male managers that I've worked with who have been accused of gross misconduct and were not suspended." Devenport Dep., p. 272. She offered no other bases for her belief that she was fired because of her sex.

To support her charge before the IDHR, Ms. Devenport prepared a list of male managers who engaged in gross misconduct but were not fired. At her deposition, however, she testified

that all but one of them would have occurred prior to Larry Dodson coming to the Chicago area – all but one of them, in other words, involved different decision-makers, different supervisors. Devenport Dep., pp. 288-291. And, significantly, with respect to the one incident that occurred during Larry Dodson's tenure, Ms. Devenport admitted that she was not sure whether the alleged gross misconduct was ever even reported to management. *Id.*, p. 291.

She testified that one employee, Milton Lynch, was accused of sexual harassment and was disciplined, but not fired; she testified that she had heard Larry Dodson was the one who set the discipline in that case, but she admitted that she had no personal knowledge about the issue. Devenport Dep., pp. 292-294. In an affidavit dated December 29, 2009, Mr. Dodson represented that none of the managers on Ms. Devenport's list of "known cases of gross misconduct" "were found to have committed terminable Gross Misconduct" while under his supervision or under circumstances where he would have been the decisionmaker. Dodson Affidavit, ¶22.

The substance of Ms. Devenport's pregnancy discrimination claim is that "my first time coming back from leave Larry [Dodson] demoted me, and my second time coming back from leave Larry fired me." Devenport Dep., p. 38. And, certainly, standing alone, these facts would cause at least a raised

eyebrow. But of course these facts don't stand alone. When Ms. Devenport's conduct is factored into the mix – her failure to improve her managerial performance in 2002/2003 and her decision to look up employees' social security numbers without their consent and to enter credit applications on behalf of those same employees, again without their consent – Mr. Dodson's actions seem reasonable, not discriminatory.

Ms. Devenport testified that, about a month after she started working as co-manager at Rolling Meadows, David Pitts, the new general manager at Rolling Meadows, took her to lunch and told her that she had better "watch her back"; she testified that Pitts told her that Dodson "definitely had a beef with me." Devenport Dep., pp. 340-341. This is consistent with Juan Anzar's testimony that Mr. Dodson had it in for Devenport. But, unfortunately for Ms. Devenport, it is not illegal for a manager to dislike an employee; nor is it illegal for a manager to want to get rid of an employee – it is only a problem in the eyes of the law if the manager's animus is based on the employee's sex, for example, or if the discriminatory animus arises because the employee is pregnant or exercising her rights under the FMLA – all things Ms. Devenport has alleged, yet none of which has been borne out by the evidence of record.

2.  The FMLA Claims

In her complaint, Ms. Devenport alleges that Sam's Club

retaliated against her, in violation of the Family Medical Leave Act, when it transferred and demoted her upon her return from leave, when it suspended her within weeks of her return from leave, and when it fired her within weeks of her return from leave.  *See* Complaint, ¶107.  She also alleges that Sam's Club interfered with her exercise of her FMLA rights when it reassigned her work, threatened her with discipline and disciplined her while she was on leave; harassed her and fired her while she was on leave; and demoted, suspended and fired her upon her return from leave.  Complaint, ¶120.

Sam's Club has moved for summary judgment on Ms. Devenport's FMLA claims, arguing that the claims are time barred and that they would fail on the merits as well.  Ms. Devenport has filed a cross motion, seeking summary judgment in her favor on these claims.

"The FMLA entitles an employee to twelve weeks of leave every twelve-month period if she is afflicted with 'a serious health condition' which renders her unable to perform her job." *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009)(quoting 29 U.S.C. § 2612(a)(1)(D)).  The Act provides that, upon returning from leave, an employee must be reinstated to the same position she held when she left on leave, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment."  29 U.S.C. §2614(a)(1); *see also Lewis*

*v. School District #70*, 523 F.3d 730, 741 (7th Cir. 2008).
The FMLA forbids an employer from interfering with an employee's
exercise of rights bestowed therein, and also forbids employers
from retaliating against employees who claim benefits under the
act. *Smith*, 560 F.3d at 699 (citing 29 U.S.C. § 2615(a)(b);
*Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)).

Generally speaking, an FMLA claim is subject to a two-year
statute of limitations; if the violation is willful, however, the
statute of limitations is three years. 29 U.S.C. §2617(c). In
either case, any claim relating to the demotion in 2002 would be
time barred (Ms. Devenport filed her complaint February 10,
2008). Additionally, absent a showing that her February 2005
suspension and termination constituted a willful violation of the
FMLA, any claim arising out of those events would similarly be
time-barred. Given the Court's finding above that Sam's Club has
offered a legitimate non-discriminatory reason for firing Ms.
Devenport and that Ms. Devenport has failed to offer evidence to
undermine or contradict Sam's Club's stated reason, Ms. Devenport
would have a very difficult time establishing that Larry Dodson
suspended and fired her because she exercised her right to take
medical leave under the FMLA or that Sam's Club's conduct
amounted to a willful violation of the FMLA. Moreover, even if
her FMLA claim concerning her 2005 suspension and firing was
timely filed, it would still fail on the merits.

To prevail on an FMLA interference claim, "an employee must demonstrate that: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to FMLA leave; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her benefits to which she was entitled. *Smith*, 560 F.3d at 699 (citing Burnett, 472 F.3d at 477). Ms. Devenport was not denied leave, and Sam's Club appears to have provided even more than was required of it under the Act; the Act does not require that the employee be paid for the entire 12 weeks of leave and yet Sam's Club paid Ms. Devenport for all 12 weeks of her first leave and for all but possibly one week of her second leave. Thus, Ms. Devenport cannot prevail on an interference claim.

"An employee who alleges that her employer retaliated against her for exercising her rights under the FMLA can proceed under the direct or indirect methods of proof familiar from employment discrimination litigation." *Smith*, 560 F.3d at 702 (citing *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 503 (7th Cir. 2004)). "An employee proceeding under the direct method must demonstrate that her employer intended to punish her for requesting or taking FMLA leave. *Id.* (citing *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir. 1999)). "The indirect method, familiar from Title VII cases, requires the employee to produce evidence that she was treated differently

33

from similarly situated employees who did not request FMLA leave, even though she was performing her job satisfactorily." *Id.* (citing *Hull v. Stoughton Trailers, LLC,* 445 F.3d 949, 951 (7th Cir. 2006)). Again, given the evidence that Ms. Devenport was not performing her job satisfactorily, it is hard to imagine that she could prevail on an FMLA retaliation claim. More importantly, Ms. Devenport has offered no evidence that the adverse employment actions she suffered had anything to do with her maternity leaves. The record shows that Sam's Club fired her because it determined, after investigating the matter, that she had applied for credit on behalf of associates who never authorized her to do so. Even if, at the end of the day, she could show that she did not enter the applications, it is undisputed that Larry Dodson believed that she had, and that his belief was based upon the documentary evidence and witness statements compiled by Juan Anzar. In short, there is no evidence that Larry Dodson fired her because she took maternity leave. Accordingly, the Court finds that Sam's Club is entitled to summary judgment on Ms. Devenport's FMLA claims; Ms. Devenport's motion for summary judgment is denied.

3.   State Law Claims (Breach of Contract and IIED)

In addition to her federal claims, Ms. Devenport alleged in her complaint two state law claims: breach of contract and intentional infliction of emotional distress. With regard to her

breach of contract claim, Ms. Devenport testified that she was referring here to the fact that Larry Dodson told her that, when she moved to the co-manager slot in Rolling Meadows, her pay would not be reduced; yet – eventually, though not initially – it was. Devenport Dep., p. 463. She also alleges that Mr. Dodson told her that she would be promoted when the next General Manager position opened, yet she was not; she testified that a position might have opened in Tinley Park, but she was not given the slot. Devenport Dep., pp. 463-464. She testified that she was "pretty sure there was" a conversation about the slot. *Id.*, p. 464. She testified that she did not know why she was not given another position. *Id.*

Sam's Club first argues that Ms. Devenport's breach of contract claim is time barred. Under Illinois law, the statute of limitations is ten years for breach of a written contract and five years for breach of an oral contract, as measured from the date of the alleged breach. *E.g., Clark v. Robert W. Baird Co., Inc.*, 142 F.Supp.2d 1065, 1075 (N.D. Ill. 2001)(citing 735 ILCS 5/13-206; 735 ILCS 5/13-205; *Hermitage Corp. v. Contractors Adjustment Co.*, 651 N.E.2d 1132, 1135 (Ill. 1995)). The contract Ms. Devenport alleges was not reduced to writing, so any claim she makes would have to fall within the five year statute of limitations. Given that the co-manager demotion occurred in November of 2002, the Court agrees that, by the time she filed

her complaint (on February 10, 2008), the limitations period would have run on any claim arising out of that demotion. It is conceivable, however, that a new breach occured each time Mr. Dodson failed to offer Ms. Devenport a newly-opened General Manager slot and that such slots may have opened after February 10, 2003 (though Ms. Devenport has offered no evidence to show when the Tinley Park slot (or any other slot) opened.

In any event, Ms. Devenport's breach of contract claim would similarly fail on the merits. To prevail on a breach of contract claim, Ms. Devenport would have to show that she and Sam's Club had a valid and enforceable contract; that she substantially performed her obligations under that contract; that Sam's Club breached the contract; and that she sustained damages as a result of Sam's Club's breach. *E.g., Reger Developmet, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010)(citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.,* 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). Ms. Devenport has failed to demonstrate that, to the extent there was a meeting of the minds as to the contract terms, she performed her obligations as agreed. Indeed, the only evidence she has offered concerning any form of agreement is the testimony described above. And this is not enough to bind Sam's Club to the obligations she seeks to impose. She has not demonstrated that the reduction in pay breached some prior agreement. There is no evidence that Sam's Club agreed not to

36

reduce her pay *ever*; in fact, the only evidence on this point suggests just the opposite: the record shows that she was advised that if she did not make some changes her pay would be reduced and her position would be in jeopardy. That is exactly how things played out.

Nor has Ms. Devenport met her burden with respect to her claim for intentional infliction of emotional distress. To survive summary judgment on her IIED claim, Ms. Devenport would have to show that the defendant's conduct was truly extreme and outrageous; that the defendant either intended to inflict emotional distress or knew there was at least a high probability that he would cause severe emotional distress; and that the conduct in fact caused Ms. Devenport to suffer severe emotional distress. *E.g., Stokes v. Board of Education of the City of Chicago*, 599 F.3d 617, 626 (7th Cir. 2010)(citing *Feltmeier v. Feltmeier,* 798 N.E.2d 75, 80 (Ill. 2003); *McGrath v. Fahey,* 533 N.E.2d 806, 809 (Ill. 1988)). Ms. Devenport has offered no evidence of truly extreme and outrageous conduct; to satisfy this element, a defendant's conduct must be "so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Stokes*, 599 F.3d at 626 (citing *Feltmeier,* 798 N.E.2d at 83). Even if Larry Dodson did everything Ms. Devenport says he did, his conduct still would not rise to this level. And the record contains no evidence that Mr

Dodson knew his conduct would cause severe emotional distress;
nor is there any evidence that Ms. Devenport actually suffered
severe emotional distress as a result of anything Mr. Dodson did.

## Conclusion

For the reasons explained above, the Court finds that Sam's
Club is entitled to summary judgment on all of Ms. Devenport's
claims. Accordingly, Sam's Club's motion for summary judgment
[#58] is granted and Ms. Devenport's motion for summary judgment
[#64] is denied. Ms. Devenport's motion to strike a portion of
Wayne Brock's affidavit [#89] is granted.


Dated: June 8, 2010

                        ENTER:


                        _Arlander Keys_____
                        ARLANDER KEYS
                        United States Magistrate Judge